OPINION OE THE REVIEW PANEL
Fletcher, Presiding Commissioner,
delivered the opinion of the Review Panel :
By H. Res. 493 the House of Representatives on October 3, 1967, 90'th Congress, referred H.R. 9326, a bill for the relief of Dr. Abraham Ruchwarger, to the Chief Commissioner of the Court of Claims, pursuant to sections 1492 and 2509 of title 28, United States Code, as amended by Pub. L. No. 89-681, 89th Cong., 2d Sess., 80 Stat. 958. The Chief Commissioner duly referred this case to Commissioner Mastín G. *1131 White for proceedings in accordance with the rules and designated the above members of the Review Panel to consider the trial commissioner’s decision on the merits of claimant’s equitable or legal right to recover.
After trial of the case, Commissioner White, on May 5, 1969, reported his decision, concluding that the claim was without merit and that any payment by Congress thereon would be a gratuity, as no amount is legally or equitably due claimants, successors-in-interest to the late Dr. Abraham Ruchwarger.
Claimants have filed no notice of intent to except to Commissioner White’s opinion, findings of fact, and conclusions within the 30 days allowed by the rules. On the contrary, claimants’ counsel has advised the commissioner by letter of May 12,1969, that he and his clients are agreed no exceptions should be filed.
The United States has requested the Review Panel to adopt the commissioner’s report with additional conclusory findings. Claimants’ only response has been a “Motion to Strike Exceptions of Respondent.” Since the Review Panel unanimously agrees with Commissioner White’s opinion, findings of fact, and conclusions as hereinafter set forth and enlarged in one minor respect, it adopts the same without oral argument as the basis of its recommendation that the claim be denied as without merit.
This determination is accordingly submitted to the Chief Commissioner for transmittal to the United States House of Representatives.
OpiNioN op ti-ie Trial Commissioner *
White, Commissioner: These proceedings under 28 U.S.C. § 2509 relate to H.R. 9326, 90th Congress, which was referred by the ITouse of Representatives to the Chief Commissioner of the Court of Claims on October 3,1967 pursuant to 28 U.S.C. § 1492.
H.R. 9326,90th Congress, was entitled “A bill for the relief of Dr. Abraham Ruchwarger,” and it proposed that the Congress enact legislation providing—
*1132 That the Secretary of the Treasury is authorized and directed to pay, from the Italian claims fund established by section 302 of the International Claims Settlement Act (22 U.S.C. 1641a), to Doctor Abraham Euchwarger the sum of $996,016, which payment shall be in full settlement of all of his claims against the said Italian claims fund.
The Italian Claims Fund established by Section 302 of the International Claims Settlement Act (22 U.S.C. § 1641a) originally consisted of $5,000,000 which the Government of Italy paid to the United States pursuant to Article II of the Memorandum of Understanding dated August 14, 1947 between the two governments (61 Stat. 3962). The fund is designed to provide compensation (as determined by the Foreign Claims Settlement Commission) for claims asserted by citizens of the United States against the Government of Italy “arising out of the war in which Italy was engaged from June 10, 1940, to September 15,1947, and with respect to which provision was not made in the treaty of peace with Italy” (22 U.S.C. § 1641c).
After the reference of H.E. 9326, 90th Congress, to the Chief Commissioner of the Court of Claims by the House of Eepresentatives, Dr. Abraham Euchwarger filed here on November 9, 1967 a petition indicating that he was seeking under H.E. 9326 compensation out of the Italian Claims Fund for currency (in the form of British pounds sterling, Swiss francs, and American dollars, having a total value in American money of approximately $996,000) which allegedly was delivered to Dr. Euchwarger by his father, Emmanuel Euchwarger, in Belgrade, Yugoslavia, sometime in May 1941 and was confiscated by Italian authorities on or about June 28, 1941 in Lubiana, Yugoslavia. Lubiana was occupied by the Italian armed forces at the time, as Yugoslavia had been overrun by the Axis armies during the period April 6-18,1941 and the country had been partitioned among the Axis powers on April 18,1941, with Italy receiving the part of Yugoslavia hi which Lubiana was located.
Pursuant to a motion which Dr. Abraham Euchwarger filed on June 28, 1968 and which was allowed by the commissioner, the petition was amended so as to include a request for compensation because of the alleged confiscation *1133 by Italian authorities on or about June 28,1941 of a deposit which Dr. Euchwarger purportedly had in a Lubiana bank and which amounted to approximately $37,460 in American money.
Dr. Abraham Euchwarger was a Yugoslav citizen and a resident of Lubiana, Yugoslavia, at the time of the alleged confiscations in June 1941. He subsequently came to the United States in 1944 and became a naturalized citizen of this country in 1953.
Difficulty was experienced in scheduling a trial, due to the circumstance that Dr. Abraham Euchwarger was a resident of Israel (although still a citizen of the United States) at the time when the petition was filed and for some months thereafter, and he was suffering from heart trouble. However, Dr. Euchwarger returned to the United States in the summer of 1968, and the trial was begun in Washington, D.C., on July 1, 1968. Trial sessions were held on that date and also on July 2 and 3. Dr. Euchwarger testified as a witness in his own behalf on July 1 and 2.
Dr. Abraham Euchwarger died on July 8, 1968. He was survived by his widow, Mrs. Zdenka Euchwarger, by a minor son, Gary Euchwarger, and by a daughter, Mrs. Miriam Euchwarger Lurie, who were Dr. Euchwarger’s heirs-at-law. Pursuant to a motion which was filed on November 1 and was allowed on November 13, 1968, Mrs. Euchwarger and the son and daughter were substituted for Dr. Euchwarger as parties to the proceedings.
Further trial sessions were held in Washington, D.C., on December 9,10,11, and 12,1968.
The findings of fact summarize Dr. Abraham Euchwar-ger’s testimony concerning the alleged confiscation by Italian authorities in Lubiana, Yugoslavia, on or about June 28, 1941 of a large amount of foreign currency which Dr. Euch-warger purportedly had received from his father, Emmanuel Euchwarger, and concerning the alleged confiscation by Italian authorities on or about June 28, 1941 of a 983,000-lira deposit which Dr. Euchwarger purportedly had in a Lubiana bank. The findings also set out facts which are based upon the preponderance of the evidence in the record *1134 and wbicb raise the most serious curacy of Dr. Euchwarger’s testimony.
For reasons that will be readily apparent upon a reading of the findings of fact, (particularly findings 20,21, and 22), it is my opinion that the alleged confiscation in June 1941 by Italian authorities in Yugoslavia of foreign currency which Dr. Abraham Euchwarger purportedly had received from his father, Emmanuel Euchwarger, and that the alleged confiscation in June 1941 by Italian authorities of a 983,000-lira deposit which Dr. Euchwarger purportedly had in a Yugoslav bank, have not been proved by credible evidence.
Furthermore, with regard to the foreign currency, it is my opinion that Dr. Abraham Euchwarger would not have had a valid claim for compensation from the Italian Claims Fund even if the preponderance of the evidence in the record proved the confiscation of the foreign currency by Italian authorities. In order to explain this point, Dr. Euchwarger’s testimony regarding the circumstances under which the foreign currency allegedly was delivered to him by his father, Emmanuel Euchwarger, is summarized in the succeeding paragraph, as follows:
At the time of the conquest and occupation of Yugoslavia by the Axis armies in April 1941, Dr. Euchwarger was living in Lubiana and his father, Emmanuel Euchwarger, was living in Belgrade. Lubiana was located in the part of Yugoslavia which the armed forces of Italy occupied, and Belgrade was located in the part of Yugoslavia which the armed forces of Germany occupied. Shortly after the occupation of the country, Dr. Euchwarger received word from his father that the latter would like for Dr. Euchwarger to visit him in Belgrade. Dr. Euchwarger traveled to Belgrade by train, went to his father’s apartment, and visited with his father for about three hours. He found his father extremely frightened and terribly upset. One son and a daughter, together with her husband, had been arrested and taken away by German authorities. The father was fearful of being arrested himself, but he could not leave Belgrade because another daughter, who was living with him at the time, was very sick and unable to move. While Dr. Euchwarger was with his father, the latter took three packages of foreign *1135 currency from a wall-safe in the living room of the apartment and handed them to Dr. Ruchwarger. The father explained that one package contained British pounds sterling, that another package contained Swiss francs, and that the third package contained American dollars. The father told Dr. Ruchwarger that the latter was to take the money back to Lubiana; that the father hoped to be able to join Dr. Ruch-warger later; and that if anything should happen to the father, Dr. Ruchwarger was to divide the money among the father’s five children (including Dr. Ruchwarger). Dr. Ruch-warger put the packages of foreign currency in a suitcase, and then traveled back to Lubiana by train.
Dr. Abraham Ruchwarger further testified that, upon returning to his home, he placed the suitcase containing the foreign currency in his wardrobe, and locked it; that subsequently he was arrested by Italian authorities on or about June 28, 1941; and that the foreign currency which his father had delivered to him, with instructions, was confiscated by Italian authorities in connection with the arrest.
Under the principles of applicable Yugoslav law, the transaction between Emmanuel Ruchwarger and Dr. Abraham Ruchwarger, as related by the latter, resulted in a bailment of the foreign currency which Emmanuel Ruchwarger delivered to Dr. Abraham Ruchwarger for safekeeping. Dr. Abraham Ruchwarger, the bailee, was bound to return the money in its entirety to his father, the bailor, if the father should be able at a later time to join Dr. Ruchwarger. At the time of ¡the alleged confiscation of the money in June 1941, the father was still alive, and the possibility of consummating the bailment through the return of the money to the father still existed. As the bailee, Dr. Abraham Ruchwarger had no property right in the foreign currency; and he was not qualified to institute a suit in his own right for the violation of the bailment by a third party (except that he could have filed a suit for the restoration of the bailment to the status quo ante). Since Dr. Ruchwarger did not have any property right in the foreign currency, he did not sustain any compensable damage when the money allegedly was confiscated by Italian authorities. Emmanuel Ruchwarger, as the bailor and the sole owner of the money, was the only *1136 person entitled to claim compensation because of the alleged confiscation of the foreign currency belonging to him.
Therefore, if Dr. Abraham Euchwarger’s testimony concerning the receipt of foreign currency from his father, Emmanuel Euchwarger, for safekeeping and the subsequent confiscation of the foreign currency by Italian authorities should be accepted as accurate in all respects, there would be no basis for the assertion of a valid claim by Dr. Abraham Euchwarger (or by the present claimants as his successors) for compensation from the Italian Claims Fund because of the confiscation of Emmanuel Euchwarger’s money in June 1941 by Italian authorities.
Accordingly, as indicated in the detailed “conclusions,” it is my opinion that the demand of Dr. Abraham Euchwarger (and of the present claimants as his successors) with respect to the alleged confiscation by Italian authorities in Yugoslavia of foreign currency and a bank deposit is not a legal or equitable claim properly payable from the Italian Claims Fund established by Section 302 of the International Claims Settlement Act (22 U.S.C. § 1641a), but is for a gratuity; and that no amount is legally or equitably due from the United States to the present claimants as successors to Dr. Abraham Euchwarger.
FINDINGS 03? Fact

The Proceedings

1. H.E. 9326, 90th Congress, 1st Session, was introduced in the House of Eepresentatives on April 26, 1967 and was entitled “A bill for the relief of Doctor Abraham Euch-warger.” It proposed that the Congress enact legislation providing—
That the Secretary of the Treasury is authorized and directed to pay, from the Italian claims fund established by section 302 of the International Claims Settlement Act (22 U.S.C. 1641a), to Doctor Abraham Euchwarger the sum of $996,016, which payment shall be in full settlement of all of his claims against the said Italian claims fund.
2. On October 3, 1967, the House of Eepresentatives adopted H. Ees. 493, providing as follows:
*1137 Resolved, That the bill (H.R. 9326) entitled “A bill for the relief of Doctor Abraham Ruchwarger”, together with all accompanying papers, is hereby referred to the chief commissioner of the Court of Claims pursuant to sections 1492 and 2509 of title 28, United States Code, for further proceedings in accordance with applicable law.
3. After the reference of H.R. 9326, 90th Congress, to the Chief Commissioner of the Court of Claims by the House of Representatives, Dr. Abraham Ruchwarger (who will usually be referred to hereafter in the findings as “the claimant”) filed here on November 9, 1967 a petition indicating that he was seeking under H.R. 9326 compensation out of the Italian Claims Fund for currency (in the form of British pounds sterling, Swiss francs, and American dollars, having a total value in American money of approximately $996,000), which allegedly was delivered to the claimant by his father, Emmanuel Ruchwarger, in Belgrade, Yugoslavia, sometime in May 1941 and was confiscated by Italian authorities on or about June 28, 1941 in Lubiana, Yugoslavia. Lubiana was occupied by the Italian armed forces at the time.
4. By means of a motion which the claimant filed on June 28, 1968, the claimant sought leave to amend the petition by including a request for compensation because of the alleged confiscation by Italian authorities on or about June 28,1941 of a deposit which the claimant allegedly had in a Lubiana bank and which amounted to approximately $37,460 in American money. The claimant’s motion was allowed on July 11, 1968, and the proposed amendment to the petition was filed on the same date.
5. (a) Difficulty was experienced in scheduling a trial, due to the circumstance that the claimant was a resident of Israel at the time when the petition was filed and for some months thereafter, and he was suffering from heart trouble.
(b) The trial was begun in Washington, D.C., on July 1, 1968. Trial sessions were held on that date and also on July 2 and 3. The claimant testified as a witness in his own behalf on July 1 and 2.
(c) The claimant died intestate on July 8, 1968. He was survived by his widow, Mrs. Zdenka Ruchwarger, by a minor *1138 son, Gary Ruchwarger, and by a daughter, Mrs. Miriam Ruchwarger Lurie, who are the claimant’s heirs-at-law.
(d) Pursuant to a motion which was filed on November 1 and was allowed on November 13, 1968, Mrs. Zdenka Ruch-warger, Gary Ruchwarger, and Mrs. Miriam Ruchwarger Lurie were substituted for the claimant as parties to the proceedings.
(e) Further trial sessions were held in Washington, D.C., on December 9,10,11, and 12,1968.
(f) A notice formally closing the proof in the case was filed by the commissioner on January 24, 1969.

Background Information Concerning Dr. Abraham Ruchwarger

6. The claimant was bom in Odessa, Russia, on September 1,1912 as the son of Emmanuel Ruchwarger and his wife. The claimant’s parents, who were Jews, fled from Russia with their children — three sons (Menasha, Ezekiel, and the claimant) and two daughters (Rosa and Zinina)- — after the Russian Revolution of 1917. The Ruchwarger family settled first in Bessarabia, which was then part of Rumania. In 1928, they moved to Yugoslavia.
7. The claimant left his parental home at the age of 17 to study medicine. He first studied for a year in Prague, and then transferred to Milan, where he completed his medical studies in 1934. The claimant thereupon returned to Yugoslavia and began a residency in surgery at Zagreb, Yugoslavia. After finishing his residency, the claimant became a civilian physician attached to a Yugoslav military hospital in Lubiana, Yugoslavia.
8. The claimant became a citizen of Yugoslavia in 1939.
9. (a) The Axis armies invaded Yugoslavia on April 6, 1941 and destroyed the Yugoslav Army in 12 days.
(b) On April 18,1941, Yugoslavia was partitioned -among the Axis powers. The province of Slovenia (except for the northern tip of this province) was occupied by the Italian armed forces; the northern part of Yugoslavia was occupied by the Rumanian armed forces; and the remainder of Yugoslavia, including the northern tip of the province of Slovenia *1139 province of Croatia, and the province of Serbia, was occupied by the German armed forces. Subsequently, the German authorities converted the province of Croatia into the so-called independent state of Croatia, and installed a puppet government. However, the German armed forces continued in control of Croatia, as a practical matter.
10. Lubiana was in the portion of the province of Slovenia which was occupied by the Italian armed forces in April 1941. At that time, the claimant was living in Lubiana and was employed there as a civilian physician attached to the Yugoslav military hospital. Shortly after the occupation, the claimant received a notice stating that he was dismissed from his position. Thereafter, the claimant was not permitted to practice his profession.
11. The claimant’s father, Emmanuel Ruchwarger, had been living in Belgrade for several years at the time of the conquest and occupation of Yugoslavia by the Axis powers in April 1941. Belgrade is located in the province of Serbia, and, therefore, it was in the part of Yugoslavia that was occupied by the German armed forces.
12. Sometime in 1942, the claimant’s father, Emmanuel Ruchwarger, died in a concentration camp located at Dubrovnik, in the Italian-occupied part of Yugoslavia.
13. In 1942, the claimant was interned by Italian authorities in a concentration camp located at Farramonti, in the southern part of Italy. While interned there, the claimant met and married his wife, who was also an internee. The claimant and his wife were released from the concentration camp by the Allied armed forces in 1944.
14. (a) The claimant and his wife came to the United States in 1944.
(b) After coming to this country, the claimant began to work in psychiatric hospitals. He was first employed in the Crownsville State Hospital in Maryland, where he worked until 1955. The claimant next worked at St. Elizabeth’s Hospital in Washington, D.O., from 1955 until 1965. He retired in 1965 because of physical disability due to heart trouble.
(c) The claimant became a naturalized citizen of the United States in 1953.

*1140
Dr. Abraham BuchwargeAs

15. The claimant’s testimony relative to the financial condition of Ms father, Emmanuel Euchwarger, before World War II is summarized in the following paragraphs of this finding:
(a) The father operated an export business in Jagodina, Yugoslavia. This business involved principally the exportation of dairy products and eggs to Switzerland, England, and Italy.
(b) The father was associated with a son-in-law in a business at Tuzla, in the province of Bosnia, Yugoslavia, that involved the exportation of grain and the importation of coffee.
(c) The father owned an apartment building, which contained 20 or 25 units and was located on Jovanova Street in Belgrade.
(d) The father spent the equivalent of about $65,000 in American money in educating his three sons.
(e) The father financed his son, Ezekiel, in the building of houses.
(f) The father built a large apartment house at No. 33 Prophet Matthew Street in Belgrade and gave it as a present to his son, EzeMel.
(g) When the claimant graduated from medical school, his father gave him as a present 1,000 British pounds sterling, wMch was the equivalent of about $5,000 in American money, in order that he might take a trip to Palestine.
(h) When one of his daughters got married, the father gave her a dowry that consisted of a house and a sum of money which was the equivalent of approximately $50,000 in American money.
16. The claimant’s testimony regarding the specific events that gave rise to the present claims is summarized in the following paragraphs of this finding:
(a) In April 1941, shortly after the conquest of Yugoslavia by the Axis powers, the claimant received a gift of money from Ms father, Emmanuel Euchwarger. The father gave the money to the claimant because the times were quite critical and the claimant might need additional money if he tried to escape from Yugoslavia. The claimant retained the *1141 money until June 20,1941, when he deposited it in the Bank of Industry and Commerce in Lubiana. The deposit amounted to 983,000 Italian lira.
(b) At the time of the conquest and occupation of Yugoslavia 'by the Axis powers, the claimant’s father had been living in an apartment on King Peter Street in Belgrade for several years. Shortly after the occupation of the country, the claimant, who was living in Lubiana, received word from his father that the latter would like for the claimant to visit him in Belgrade. The claimant obtained from the Italian police in Lubiana a permit which authorized him to travel to Belgrade, which was located in the German-occupied part of Yugoslavia. The claimant made the trip from Lubiana to Belgrade on a through train, which took 5 or 6 hours to travel the distance between the two cities. There were no border checks during the course of the trip. The claimant arrived in Belgrade late in the evening; he went to his father’s apartment; and he remained with his father for about 3 hours.
(c) The claimant found his father extremely frightened and terribly upset. The father cried most of the time while the claimant was with him, and was hardly able to talk. One son and a daughter, together with her husband, had been arrested and taken away by German authorities. The father was fearful of being arrested himself, but he could not leave Belgrade because another daughter, who was living with him at the time, was very sick and unable to move.
(d) While the claimant was with his father, the father took three packages of foreign currency from a wall-safe in the living room of the father’s apartment, and handed them to the claimant. The father explained that one package contained British pounds sterling, that another package contained Swiss francs, and that the third package contained American dollars. The father told the claimant that the latter was to take the money back to Lubiana; that he (the father) hoped to be able to join the claimant later; and that if anything should happen to him (the father), the claimant was to divide the money among the brothers and sisters.
(e) The claimant put the three packages of foreign currency in a suitcase, and then traveled back to Lubiana that *1142 same night. He reached Lubiana morning. Upon returning to his home, the claimant placed the suitcase containing the foreign currency in his wardrobe, and locked it.
(f) At about 4:00 a.m. on June 28, 1941, Italian police came to the claimant’s home in Lubiana and arrested him. He was taken first to the police headquarters and then to jail. The claimant remained in the jail at Lubiana for about 9 months.
(g) The claimant never again saw the foreign currency which his father had delivered to him.
(h) While the claimant was imprisoned in the jail at Lubiana, the following official document was issued relative to the expropriation of the foreign currency which the claimant’s father had delivered to him:
INTENDENZA DI FINANZA DI LUBIANA
Prot. N._Eip._ AL Direttore del carcere Eisposta a nota del_ giudiziario per la Pro-Div. _ Sez. __ No. _ vincia di Lubiana OGGETTO: _._:_ Visti gli atti relativi a Buchwarger Dott.Abramo di Emanuele, nato a Odessa, Bussia, ex-impiegato presso l’Ospedale militare di Lubiana, di razza ebraica ed ora internato civile di guerra al carcere giudiziario per la Provincia di Lubiana, si conferma la ricevuta della E. Questura di Lubiana per i seguenti beni confiscaiti dal Dott. Buchwarger Abramo al tempo di suo arresto a Lubiana il 28 giugno 1941-XIX. nell’ammontare di Lire sterline 194.120. (centonovaataquattromillecent oventi Lire ster line) Franc hi svizzeri 283.000. (duecen-toottantatre mille Franchi svizzeri) Dollari americani 94.000. (novantaquattromille Dollari americani)
Visto il decretto-legge dell’Alto Commissario per la Provincia di Lubiana in data 3.9.1941.-XIX.n.292 i beni del Dott. Buchwarger Abr amo sopramenzionati si dichiarano espropriati.
Per la notifica all’interessato,
Lubiana, il 16 settembre 1941-XIX.
il Direttore dell’Ufficio di Tesoro /s/FLAVIO BOI
*1143 (i) The English translation of the document referred to in paragraph (h) of this finding is as follows:
Department of Finance of Lubiana
Protocol No._Re-view — To the Director of the Judici-
Reply to letter of_ ary Prison for the Province
Div.__Sec_No_of Lubiana
REFERENCE: '___
In view of the acts relative to Doctor Abraham Ruch-warger, son of Emanuel, born at Odessa, Russia, former employee at the military hospital of Lubiana, of the Hebrew race and now a civil internee of war in the judicial prison for the province of Lubiana, there is confirmed the receipt of the Royal Department of Investigation for the following articles of property confiscated by the said Doctor Abraham Ruchwarger at the time of his arrest at Lubiana on the 28th of June in the XIX year [i.e., of the Fascist government] in the amount of 194,120 pounds sterling, 283,000 Swiss francs, and 94,000 American dollars.
In view of the decree-law of the High Commissioner for the Province of Lubiana of the date of March 9, 1941— XIX n. 292 the articles of. property of the said Doctor Abraham Ruchwarger mentioned above are declared expropriated.
For notice to the interested person,
Lubiana, the 16th of September, 1941' — XIX
The Director
of the Office of the Treasurer /s/ FLA VIO BOI
(j) On March 16,1942, the following official document was issued relative to the expropriation of the foreign currency which the claimant’s father had delivered to him and the expropriation of the claimant’s 983,000-lira deposit in the Lubiana bank:
DIREZIONE CARCERI GUID.-ROMA
Ruchwarger Abramo di Emanuele Nr. 808 Visti gli atti relativi a Ruchwarger Dott.Abramo di Emanuele, nato a Odessa, Russia, ex-impiegato presso l’Ospedale militare di Lubiana, di razza ebraica ed ora internato civile di guerra al carceri giudiziari di Roma, *1144 si conferiría la ricevuta della E.Questura di Lubiana per i seguenti beni confiscati dal Dott. Kuclrwarger Abramo al tempo di suo arresto il 28 giugno 1941-XIX.nell’ ammontare di Lire sterline 194.120.
Dollari americani 94.000.
Franchi svizzori 288.000.
Lire italiane 983.000.
Visto il decreto-legge del’Alto Commissario per la Provincia di Lubiana in data 3.3.1942-XX.n.292 i beni del Dott.Abramo Euchwarger sopramenzionati si dichia-rano espropriati.
Per la notifica all’interessato, il Direttore
[s] SALVATOEE LOCATELLI Eoma, il 16 marzo 1942-XX.
(k) The English translation of the document quoted in paragraph (j) of this finding is as follows:
Administration of the Judicial Prisons, Eome
Abraham Euchwarger [son] of Emanuel No. 808
In view of the acts relative to Dr. Abraham Euch-warger [son] of Emanuel, born at Odessa, Eussia, former employee at the Military Hospital of Lubiana, of the Hebrew race and now a civil internee of war, in the judicial prisons of Eome, there is confirmed the receipt of the Eoyal Police of Lubiana for the following property confiscated by Dr. Abraham Euchwarger at the time of his arrest June 28, 1941-XIX [Fascist year] in the sum of Pounds sterling 194,120 American dollars 94,000
Swiss francs 283,000
Italian lire 983,000
In view of the decree-law of the High Commissioner for the Province of Lubiana of the date of March 3,1942-XIX [Fascist year] No. 292 the property of Dr. Abraham Euchwarger mentioned above is declared [to be] expropriated.
For notice to the interested person,
The Director,
/s/ SALVATOEE LOCATELLI Eome, March 16,1942-XX [Fascist year]
(l) In addition to the document set out in paragraph (j) of this finding, there was also issued on March 16, 1942 the *1145 following official document relative to the expropriation of the claimant’s 983,000-lira deposit in the Lubiana bank:
DIREZIONE CARCERI GIUD. ROMA
Ruch. Abraham
A richiesto del Dott. Ruchwarger Abramo di Emanu-ele, nato a Odessa, Russia, ex-impiegato presso l’Ospe-dale militare di Lubiana, di razza ebraica ed ora internato civile di guerra al carcere giudiziario di Roma, si attesta in base _al decreto-legge dell’ Alto Commisario per la Provincia di Lubiana in data 2.3.1942-XX.n625 che il deposito di 983.000 Lire italiane fatto dall Dott. Ruch-warger Abramo presso la Banca dell’ industria e com-mercio di Lubiana il 20.6.1941 si dichiara espropriato.
Per la notifica all’ interessato, il Direttore
/s/ SALVATORE LOCATELLI Roma, il 16 marzo 1942-XX.
(m) The English translation of the document referred to in paragraph (1) of this finding is as follows:
ADMINISTRATION, JUDICIAL PRISON, ROME Ruch. Abraham
At the request of Dr. Abraham Ruchwarger [son] of Emanuel, born at Odessa, Russia, former employee at the Military Hospital of Lubiana, of the Hebrew race, and now a civil internee of war at the Judicial Prison of Rome, it is attested upon the basis of the decree-law of the High Commissioner for the Province of Lubiana of the date of March 2, 1942-XX [Fascist year] no. 625, that the deposit of 983,000 Italian lire made by Dr. Ruchwarger at the Bank of Industry and Commerce of Lubiana on June 20, 1941, is declared [to be] expropriated.
For notice to the interested person, the Director
/s/ SALVATORE LOCATELLI Rome, March 16,1942-XX [Fascist year]

Findings Indicating Invalidity of Claims

17. The preponderance of the evidence in the record relative to the financial condition of the claimant’s father, *1146 Emmanuel Ruchwarger (see finding 15), indicates as follows:
(a) Emmanuel Ruchwarger was not a wealthy man, but was a man of only modest financial means.
(b) Before World War II, Emmanuel Ruchwarger operated a small retail store in Belgrade, selling milk and eggs.
(c) Emmanuel Ruchwarger did not own an apartment building located on Jovanova Street in Belgrade, or any other real estate.
(d) Emmanuel Ruchwarger did not build the apartment house located at No. 33 Prophet Matthew Street in Belgrade and give it as a present to his son, Ezekiel. Instead, the construction of this building was financed by Moncilo Belobrk, an architect and engineer, to the extent of 500,000 dinars, by Andrea Barta to the extent of 500,000 dinars, and by Ilona Ruchwarger to the extent of 400,000 dinars. Ilona Ruchwarger was the wife of Ezekiel Ruchwarger and a daughter-in-law of Emmanuel Ruchwarger. The 400,000 dinars which she supplied to assist in financing the construction of the apartment house comprised her dowry. When the apartment house at No. 33 Prophet Matthew Street was completed, Moncilo Belobrk owned a three-eighths interest in the property, Andrea Barta owned a three-eighths interest in the property, and Ilona Ruchwarger owned a two-eighths interest in the property. Emmanuel Ruchwarger did not supply any money for the construction of the building, and he never had any financial interest in the property.
(e) Emmanuel Ruchwarger’s annual income was comparatively small. His income in 1939 was equivalent to approximately $1,000 in American money; and his income in 1940 was equivalent to approximately $1,300 in American money.
18. With respect to the round-trip by train which the claimant allegedly made between Lubiana and Belgrade in April or May of 1941, after the occupation of Yugoslavia by the Axis powers (see paragraphs (b) and (e) of finding 16), the preponderance of the evidence in the record indicates as follows:
*1147 (a) It was practically impossible at that time for any Yugoslav citizen, especially a Jew, to obtain permission to travel anywhere outside the province in which he resided.
(b) The Italian police in the Italian-occupied part of Yugoslavia could not grant a permit authorizing a Yugoslav citizen to travel into the German-occupied part of Yugoslavia. Anyone desiring to travel in the German-occupied portion of Yugoslavia could do so only by obtaining a permit from the German authorities. (The claimant, according to his testimony, had only a travel permit issued by the Italian police.)
(c) In traveling by train from Lubiana to Belgrade, it was necessary to cross the following borders: (1) the border between the Italian-occupied portion of Slovenia and the German-occupied portion of Slovenia; (2) the border between the German-occupied portion of Slovenia and the independent state of Croatia; and (3) the border between the independent state of Croatia and German-occupied Serbia. In returning from Belgrade to Lubiana, it was necessary to cross the same borders in the reverse order. At each border crossing, the respective authorities maintained check-points where passengers and their baggage were carefully checked. The transportation of foreign currency was prohibited. (The claimant, according to his testimony, did not pass any check-points in traveling from Belgrade to Lubiana with a suitcase containing foreign currency having a value equivalent to approximately a million dollars in American money.)
(d) The distance between Lubiana and Belgrade is 564 kilometers, or approximately 400 miles. Before World War II, it required about 10 hours for the fastest train to make the trip between the two cities. After the partition of Yugoslavia among the Axis powers in April 1941, a one-way trip by train between Lubiana and Belgrade required more than 24 hours. (According to the claimant’s testimony, it took him 5 or 6 hours to travel by train between Lubiana and Belgrade.)
19. With respect to the claimant’s testimony to the effect that, on the occasion of his visit to his father, the father took from a wall-safe in the living room of the father’s apartment three packages of foreign currency and handed them to the claimant with instructions (see paragraph (d) of finding
*1148 16), tbe preponderance of the evidence cates that the apartment which the claimant’s father occupied a,t that time never contained a wall-safe.
20. With respect to the purported document dated September 16, 1941 concerning the alleged expropriation of the foreign currency (see paragraphs (h) and (i) of finding 16), the preponderance of the evidence in the record indicates as follows:
(a) A Provincial Office of the Treasury was established at Lubiana by the Italian government on July 15,1941. The office was under the supervision of a Director of the Treasury. The holder of this position was Gugliemo Mondadori from July 15 to October 14, 1941, and was Francesco LaGassa from October 15, 1941 until the time when the Provincial Office of the Treasury in Lubiana was closed on November 3, 1943.
(b) Flavio Boi, the purported signer of the document dated September 16,1941, was an official in the Italian Ministry of the Treasury. Throughout his official career from 1911 to 1948, he served in subordinate offices of the Italian Treasury located on the Island of Sardinia and in the southern part of Italy. He never served in Lubiana at any time.
(c) The Provincial Office of the Treasury at Lubiana made use in 1941 of printed letterheads with the royal arms of the King of Italy and the heading “Intendenza di Finanza.” Superimposed on these letterheads was the following legend by means of a rubber stamp: “R. Ufficio Provinciate del Tesoro-Lubiana.”
(d) The correct title of the official in charge of the Provincial Office of the Treasury at Lubiana was “II Direttore del Tesoro,” or “II Direttore dell’Ufficio del Tesoro.”
(e) The captions of most Italian governmental offices in 1941 were preceded by the letter “R.” (standing for “Regia” (Royal)), inasmuch as Italy was a monarchy in 1941.
(f) There is no protocol number or file number shown on the document. Such numbers are customarily placed on official documents in Italy, and especially on a document of this importance. *1149 (g) The Archives of the State of Italy show no record of the purported decree law of the Italian High Commissioner for Lubiana referred to in the document of September 16, 1941 as “decretto-legge dell’Alto Commissario per la Provin-cia di Lubiana, in data 3.9.1941-XIX, n. 292.”
(h) The archives of the “Institute for History of the Workers’ Movement” in Lubiana (Yugoslav State Archives) contain copies of all published laws, orders, and decisions of the Italian High Commissioner for Lubiana issued during the period 1941-1943 and dealing, inter alia, with confiscations of monies and securities. No trace was found in the archives of that Institute of any decree law which corresponded with the date and number of the purported decree law referred to in the document of September 16, 1941.
(i) The document of September 16, 1941 contains grave grammatical errors. In the clause “al tempo di suo arresto,” the article is missing, which is a common mistake made by Slavs who speak Italian. It should correctly read, “al tempo del suo arresto.” Also, the term “confiscati dad” [confiscated by] is illogical. It should correctly read “confiscati al” [confiscated from]. Furthermore, the article designating the office in the signature line should be “Ufficio del Tesoro,” not “Uffi-cio di Tesoro.” In addition, there is an error in the spelling of the numerals; instead of “novantaquattro milis” (ninety-four) , it should be “novantaquattro mila.”
(j) Under Italian administrative law as it existed in 1941-1942 (and as it still exists today), an “Intendenza di Finanza” was an office which did not have cash facilities, and it could not receive monies. The responsible disbursing and receiving offices (cashiers) of the Italian government in the provinces were (and are) the provincial sections of the Treasury.
(k) The document of September 16, 1941 is addressed to the Director of the Judicial Prison of the Province of Lubiana. It was and is the administrative custom in Italy to place a rubber stamp on a document received by the addressee office, showing the date of the receipt and the protocol number .of receipt of the document itself. No receipt stamp appears on the document dated September 16,1941.
(l) Under Italian law, an execution procedure- — like the seizure of monies — is taken pui’suant to a judgment. The *1150 judgment is then served on the owner There is never a receipt issued.
(m) It is not the custom in Italy for any “Direttore” to sign official documents with his first name in full.
21. With respect to the purported documents dated March 16,1942 (see paragraphs (j) through (m) of finding 16), the preponderance of the evidence in the record indicates as follows:
(a) The documents referred to the claimant as being interned at the time in the Judicial Prison of Rome, but the claimant was not imprisoned in Rome during the month of March 1942. It was not until May 6, 1942 that the Italian police in Lubiana issued to the claimant a “compulsory travel order,” directing him to proceed and report to the police authorities at Cosenza in order to be placed in a concentration camp not later than the 12th of that month. The claimant got as far as Rome, and then stayed in that city instead of proceeding to Cosenza. lie was arrested in Rome on August 16, 1942; he was charged with having violated the terms of the compulsory travel order; and he was sentenced to a 30-day j ail term. The claimant was released from the j ail in Rome on September 16,1942, and was transferred to a concentration camp at Farramonti. The claimant was interned in the concentration camp at Farramonti until the time in 1944 when he and his wife were released by the Allied armed forces.
(b) Salvatore Locatelli, the purported signer of the documents dated March 16, 1942, was never a Director of the Judicial Prison in Rome. Indeed, no person of that name was ever employed in the Italian Judicial Prison System in any capacity.
(c) A director of a prison could not effect a confiscation of money. Under Italian regulations setting forth the duties, powers, and functions of a director of a prison, he performs purely administrative functions, and he has no power to decide or enforce confiscations of property.
(d) There are no registration or file numbers on the documents dated March 16,1942. Such an omission is unlikely, if not impossible, on a document issued by the Italian prison administration.
*1151 (e) The document set out in finding 16(j) contains grammatical errors, e.g., in tbe clause “al tempo di suo arresto,” where the article is missing, which is a common mistake by Slavs who speak Italian.
(f) The text of each of the documents dated March 16, 1942 contains improper legal terminology. The documents should not have declared the money to be expropriated, but to be confiscated.
(g) The document set out in finding 16(h) states that reference is made to the receipt issued by the Eegia Questura di Lubiana. Under Italian law, the “Eegia Questura” could not have issued a receipt, but it was compelled to draw up a “proces verbal” for the impounding of monies. Therefore, the document should have stated, “Taking into account the ‘proces verbal’ drawn up by the ‘Eegia Questura,’ ” etc.
(h) The document quoted in finding 16(h) states at the end, “For notice to the interested party.” Under Italian administrative practice, such clause would not be used in a document of this type. In any event, if the document directed that someone was to be “notified,” it would have to show the registration number and the date of the notification.
(i) The document quoted in finding 16(1) starts out by saying that it was issued “At the request of Ur. Abraham Euchwarger * * At the end, the document provides “For notice to the interested person.” This final clause is illogical from the standpoint of Italian official usage, since the claimant supposedly asked for the document himself.
(j) The Archives of the State of Italy show no record of the purported decree laws of the Italian High Commissioner of Lubiana, identified in the document quoted in finding 16(j) as “decreto-legge del’Alto Commissario per la Provincia di Lubiana in data 3.3.1942-XX, n. 292,” and in the document quoted in finding 16(h) as “decretto-legge dell’Alto Commissario per la Provincia di Lubiana in data 3.9.1941-XIX. n. 292.”
(k) The archives of the “Institute for History of the Workers’ Movement” in Lubiana (Yugoslav State Archives) contain copies of all published laws, orders, and decisions of the Italian High Commissioner for Lubiana during the period 1941-1943 and dealing, inter alia, with confiscations of *1152 monies and securities. No trace was found in the archives of that Institute of any decree laws which corresponded to the dates and numbers of the decree laws referred to in the documents dated March 16,1942.
22. The Bank of Industry and Commerce in Lubiana has no record of the claimant ever having a 983,000-lira deposit, or any other amount, in that bank.

Applicable Yugoslav Law

23. Although Yugoslavia was a politically united country after December 1,1918, the Yugoslav legal system was not yet uniform as late as 1941. In the territory of Serbia (that part of Yugoslavia which included Belgrade), the governing law in 1941 was the Serbian Civil Code of 1844. In the territory of Slovenia (that part of Yugoslavia which included Lubiana), the governing law in 1941 was the Austrian Civil Code of 1811, as amended. Both codes contain provisions relating to the nature of legal transactions which are or could be applicable in this case, such as the norms of contract (including gifts), inheritance rights and legacies, and bailments. Both codes are similar and closely related, though often different in formal language. The Austrian Civil Code is an abbreviated edition of the French Civil Code of 1804. The Serbian Civil Code, in turn, is an abbreviated edition of the Austrian Civil Code.
24. The legal nature of the transaction which allegedly occurred between the claimant and his father in Belgrade in April or May of 1941 must be determined according to the applicable rules of the Serbian Civil Code of 1844.
25. (a) Art. 561 of the Serbian Civil Code provides as follows with regard to gifts :
The gift is when somebody gives to another person a thing not asking and not receiving in return any consideration.
(b) Under Serbian law, a gift can be inter vivos or causa mortis. In the former case, the principles of contract law apply; in the latter case, the principles of the inheritance law are applicable.
*1153 26. (a) In case of a gift inter vivos, the language of the donor must be unmistakably clear and unequivocal, expressing his will to abandon immediately the legal title and possession of the property in question, without any consideration and without any conditions for the benefit of the donor. Only in such case, and if the donee is in physical possession of the res, does the legal title or ownership pass immediately and fully from the donor to the donee. If conditions are attached to the purported gift, the transaction ceases to be an outright gift, and it is .regarded as an ordinary contract in view of the conditions attached thereto.
(b) In view of the principles stated in the preceding paragraph, the transaction which supposedly occurred between the claimant and his father in 1941 in Belgrade was not an outright gift from the father to the claimant. There was no clear and unequivocal language of the father expressing his will to abandon his title or property in the foreign currency which would take an immediate and irrevocable effect. On the contrary, conditions and instructions were imposed by the father, which had to be followed by the claimant in order to fulfill the purpose of this transaction. In consequence, the legal rules governing the legal effects of a gift are not applicable in the present case.
27. (a) The alleged transaction between the claimant and his father was not a gift causa mortis. The Serbian Civil Code defined a gift causa mortis in Art. 568 as follows:
A gift causa mortis is considered to be a legacy or bequest and as such it will be considered.
(b) Interpreting Article 568 of the Serbian Civil Code, the Supreme Court of Serbia, in its decision No. Bev. 840/34, of January 14,1936, stated as follows:
A gift causa mortis must be made in the form of a testamentary disposition in order to be recognized as valid.
(c) While the Serbian Civil Code recognizes an oral testament as valid in case of war — which was the situation in Yugoslavia in April and May of 1941 — Art. 447 still requires that such testament be made in the presence of two witnesses who are able to confirm the existence of such testament before the court. In the present case, no witnesses were present at *1154 the supposed transaction and, in consequence, a gift causa mortis, which, requires a recognized form of testamentary disposition, could not have been established by the transaction.
(d)Moreover, a gift causa mortis does not become effective until the donor’s death. Here, the father was alive in June 1941, when the foreign currency was supposedly confiscated. Hence, at the time of the alleged confiscation, the claimant could not have any right in the money under a theory of gift causa mortis.
28. (a) The legal nature of the alleged transaction between the claimant and his father was a bailment. The claimant, as the bailee, received the foreign currency for safekeeping, with instructions from the father. He was bound to return the money in its entirety to his father, the bailor, should the father be able at a later time to join the claimant.
(b) Art. 569 of the Serbian Civil Code defines a bailment as follows:
Bailment is a contract by which someone receives the property of another for safekeeping with the obligation to return the property undamaged.
(c) Art. 571 of the Serbian Civil Code provides:
The property received for safekeeping cannot be used by the keeper for his benefit in any way.
(d) The claimant’s position and rights as a bailee must 'be determined under the law of the place where he resided with the foreign currency and where the money was allegedly confiscated in June 1941. This place was 'Lubiana, Slovenia, where the Austrian Civil Code of 1811, as amended, was in force at that time.
(e) Under the Austrian Civil Code, a bailee has no property right whatsoever in the bailed object (no jus in rem). Art. 958 of the Austrian Civil Code provides:
By bailment the bailee does not obtain either property rights, or possession, or the right to use the thing. He is a holder only with the duty to protect the property entrusted to him from any damage.
(f) The Austrian Civil Code makes a legal distinction between “ownership,” “possession,” and “holding.” “Owner *1155 ship” connotes full legal title to the res; “possession” connotes a weaker legal title, called title animus possidendi; “holding” connotes no legal title and no jus in rem.
(g) A bailee under the Austrian Civil Code is not qualified to institute a suit in his own right for the violation of a bailment by a third party, except that he may file a suit for the reinstitution of the bailment to the status quo ante if the bailment has been interrupted by an action of a third person. Since a bailee has no property right in and with respect to the object received, no compensable damage is suffered by him in the event of the conversion of the property by a third person, or other action by a third person resulting in the discontinuation of the bailment. The bailor is the only party who is entitled to claim compensation from a tortfeasor because of the conversion of, or damage done to, the bailed property.
(h) At the time of the alleged confiscation, the claimant’s father would have been the exclusive owner of the foreign currency purportedly involved in the confiscation, and would have been the only person entitled to claim compensation because of the alleged confiscation of the money.
CoN CLTTSIONS
1. It is concluded that the alleged confiscation by Italian authorities in Yugoslavia from Dr. Abraham Ruchwarger in June 1941 of 194,120 British pounds sterling, 283,000 Swiss francs, and 94,000 American dollars, which Emmanuel Ruch-warger purportedly had delivered to Dr. Abraham Ruch-warger with instructions, has not been proved by a preponderance of the evidence in the record, and that the contents of the document introduced into evidence in support of such alleged confiscation are not credible.
2. It is concluded that the alleged confiscation by Italian authorities in June 1941 of a 983,000-lira deposit, which Dr. Abraham Ruchwarger purportedly had in a Yugoslav bank, has not been proved by a preponderance of the evidence in the record, and that the contents of the documents introduced into evidence in support of such alleged confiscation are not credible.
*1156 3. It is concluded that if the in the record proved (which it does not) the confiscation in June 1941 by Italian authorities in Yugoslavia of foreign currency previously delivered by Emmanuel Euchwarger to Dr. Abraham Euchwarger for safekeeping and with instructions regarding its disposition in the event the return of the money to Emmanuel Euchwarger became impossible, only Emmanuel Euchwarger would have been entitled under Yugoslav law to claim compensation because of the confiscation of the money.
4. It is concluded that the Congress should be advised that the demand of Dr. Abraham Euchwarger, and of the present claimants as his successors, is not a legal or equitable claim properly payable from the Italian Claims Fund established by Section 802 of the International Claims Settlement Act (22 U.S.C. § 1641a), but is for a gratuity.
5. It is concluded that the Congress should be advised that no amount is legally or equitably due from the United States to the present claimants as successors to Dr. Abraham Euchwarger.

The opinion, findings of fact, and conclusions axe submitted under the order of reference and the Rules of the Chief Commissioner.